R. SCOTT JERGER, Oregon Bar No. 023377
Field Jerger LLP
American Bank Building
621 SW Morrison Street, Suite 510
Portland, OR 97205
(503) 228-9115
scott@fieldjerger.com

MICHAEL RAY HARRIS, Colorado Bar No. 35395 (*pro hac vice pending*)
Friends of Animals
Western Region Office
7500 E. Arapahoe Road, Suite 385
Centennial, CO 80112
(720) 949-7791
michaelharris@friendsofanimals.org

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PENDLETON DIVISION

| | |
|---|---|
| FRIENDS OF ANIMALS, a New York not for profit corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>RYAN ZINKE, in his official capacity as the U.S. Secretary of the Interior; and<br><br>THE UNITED STATES BUREAU OF LAND MANAGEMENT, an agency of the United States;<br><br>    Defendants. | Case No. 2:18-cv-01473<br><br>**COMPLAINT** |

Complaint

**INTRODUCTION**

1. In recent years, the question of providing a place for wild horses on federal public lands has become a controversial issue. Ranchers and others who desire to utilize public lands for commercial activities, primarily in the western United States, desire to have wild horse populations greatly reduced, if not eliminated completely in some areas. Americans, however, who see the wild horse as a symbol of freedom and wildness, want to see greater protections for these wild animals.

2. While Americans may not see eye to eye on whether to leave wild horses on public lands, a vast majority of Americans do believe one thing—that wild horses should not be wantonly killed or injured as a result of human management. Indeed, despite initially authorizing the killing of excess wild horses in the 1971 Wild Free-Roaming Horses and Burro Act (WHBA), since 2009 Congress has expressly denied the use of funds to destroy horses in response to public concern over the practice.

3. Even so, in recent years, the Bureau of Land Management (BLM) has sought greater authority to undertake management activities that would lead to the destruction of wild horses. Notably, BLM has asked Congress for greater authority to sell tens of thousands of wild horses to third parties who would resell them to horse slaughter houses outside the United States.

4. Congress has not acted on BLM's requests. Instead, in 2018, Congress again denied BLM use of any taxpayer funds that would directly or indirectly lead to the slaughter of wild horses under the care of BLM.

5. On May 25, 2018, BLM issued the 2018 Guidance for the Sale of Excess Wild Horses and Burros ("2018 Wild Horse Sale Rule") and indicated it was binding and effective immediately. Even so, the rule was not made public until July 20, 2018.

6. BLM did not provide the public notice of the 2018 Wild Horse Sale Rule before it implemented it, nor did BLM solicit comments on the 2018 Wild Horse Sale Rule.

2

Complaint

7. The 2018 Wild Horse Sale Rule calls for BLM Field Offices to take aggressive steps to increase the volume of wild horses sold to private parties. These horses are currently held in BLM holding facilities after being removed from the range.

8. The 2018 Wild Horse Sale Rule removes many of the procedural safeguards put in place to prevent the sale of horses to individuals that seek to resell them to slaughter horses. Many of these safeguards were put into place as a result of a major scandal in 2012, where approximately 1,700 wild horses were sold to a single individual over a period of time, and subsequently sent to slaughter. The new rule would not only make the likelihood of this occurring again, it actually seems to suggest that BLM employees should turn a blind eye toward buyers who want wild horses for resale to slaughter houses.

9. Any change in rules that seeks to urgently sell off wild horses under BLM's care is of great concern to Friends of Animals and its members. Like a majority of Americans, Friends of Animals would like to see more horses left on public lands, and less horses being taken from the range to be held in captivity until BLM can find a way to send them to slaughter. The 2018 Wild Horse Sale Rule can also undermine Friends of Animals' ongoing efforts to force BLM to consider returning some wild horses to the range. For instance, Friends of Animals successfully challenged a 2016 emergency roundup decision where horses were completely removed from one pasture in the Three Fingers Wild Herd Management Area in Eastern Oregon. The Court remanded the case to BLM. Friends of Animals is seeking a decision from BLM on remand that would return some of the removed horses. However, it can often take several years before removed horses can be returned after an emergency removal. The 2018 Wild Horse Sale Rule requires Oregon BLM officials to sell off the Three Finger wild horses as quickly as possible, thus potentially undermining any relief Friends of Animals seeks.

10. Friends of Animals challenges the 2018 Wild Horse Sale Rule on three grounds. First, it is a rule subject to notice and comment rulemaking under the

3

Complaint

Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* In issuing the rule, BLM failed to follow the proper procedures. Second, the rule is an arbitrary and capricious reversal of BLM's past policies. Before issuing the 2018 Wild Horse Sale Rule, BLM failed to fully consider the potential of the rule reducing safeguards to prevent the resale of horses to slaughter houses. Finally, the 2018 Wild Horse Sale Rule violates the 2018 Consolidated Appropriations Act, which specifies that: "Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products." Pub. L. No. 115-141, 132 Stat. 348.

## PARTIES

11. Friends of Animals is a non-profit, international animal advocacy organization, incorporated in the state of New York since 1957. Friends of Animals works to cultivate a respectful view of nonhuman animals, free-living and domestic. Friends of Animals' goal is to free animals from cruelty and institutionalized exploitation around the world. Friends of Animals informs its members about animal advocacy issues and its progress in addressing them through its magazine, *ActionLine*, its website, social media, and other public reports. Friends of Animals is a leading organization advocating for the preservation of wild horses on public lands. Friends of Animals has published numerous articles on wild horses and BLM's management policies. Friends of Animals and its members have a significant interest in the wild horses subject to the 2018 Wild Horse Sale Rule. Friends of Animals members regularly view, photograph and study wild horses.

12. Defendant RYAN ZINKE is the United States Secretary of the Interior and is sued in his official capacity. Secretary Zinke is responsible for ensuring that agencies housed within the Department of the Interior, including BLM, comply with the requirements of all federal laws.

13. Defendant BUREAU OF LAND MANAGEMENT is an agency located within the Department of the Interior. The mission of the BLM is "[t]o sustain the health, diversity, and productivity of America's public lands for the use and enjoyment of present and future generations." The agency administers over 245 million surface acres of public lands, most of which are located in twelve Western states, including Oregon. BLM is responsible for ensuring that federally-administered actions comply with the requirements of all federal laws.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This action presents a case and controversy arising under the Consolidated Appropriations Act and the Administrative Procedure Act. Pub. L. No. 115-141, 132 Stat. 348; 5 U.S.C. §§ 701 *et seq.* This Court also has jurisdiction pursuant to 28 U.S.C. § 1346, as the United States is a defendant. The relief sought is authorized by 28 U.S.C. § 2201 (declaratory judgment) and 28 U.S.C. § 2202 (injunctive relief). Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(e), as Defendants maintain offices in this District, including the Burns Wild Horse Corrals where horses subject to the challenged rule are subject to sale.

## STATUTORY BACKGROUND

**A.    The Administrative Procedure Act.**

15. The Administrative Procedure Act (APA) governs the internal procedures of administrative agencies, including how they interact with the public. The APA defines an "agency" broadly to mean "each authority of the Government of the United States," unless expressly excluded by the Act.

16. The APA authorizes a reviewing court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2).

17. BLM is not expressly excluded from the APA.

18. The APA defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

19. The APA defines "rule" to include "the whole or part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4).

20. According to the APA, "rule making" is the "agency process for formulating, amending, or repealing a rule." *Id.* § 551(5).

21. Before making a rule, an agency must publish notice of the proposed rulemaking in the Federal Register, "unless persons subject thereto are named and either personally served or otherwise have actual notice thereof in accordance with law." 5 U.S.C. § 553(b).

22. The notice must include: "(1) a statement of the time, place, and nature of public rule making proceedings; (2) reference to the legal authority under which the rule is proposed; and (3) either the terms or substance of the proposed rule or a description of the subjects and issues involved." *Id.* §§ 553(b)(1)-(3).

23. After notice, the agency must give interested persons an opportunity to participate in the rulemaking through submission of written data, views, or arguments. 5 U.S.C. § 553(c). The agency must publish notice of a legislative or substantive rule at least thirty days before its effective date, except for "(1) a substantive rule which grants or recognizes an exemption or relieves a restriction; (2) interpretative rules and statements of policy; or (3) as otherwise provided by the agency for good cause found and published with the rule." *Id.* § 553(d).

Complaint

**B.     The Wild Free-Roaming Horses and Burros Act.**

24.    In 1971 Congress passed the Wild Free-Roaming Horses and Burros Act (WHBA), 16 U.S.C. §§ 1331 *et seq.*, finding that "wild free-roaming horses and burros are living symbols of the historic and pioneer spirit of the West; that they contribute to the diversity of life forms within the Nation and enrich the lives of the American people; and that these horses and burros are fast disappearing from the American scene." 16 U.S.C. § 1331.

25.    The WHBA requires BLM to "protect and manage wild free-roaming horses and burros as components of the public lands . . . in a manner that is designed to achieve and maintain a thriving, natural ecological balance on the public lands." 16 U.S.C. § 1333(a).

26.    In passing the WHBA, Congress intended the management of wild horses to be kept to a minimal level both to reduce costs and to deter "zoolike" developments.

27.    The WHBA requires Defendants to protect wild horses on public lands.

28.    Defendants are authorized to manage wild horses only "in a manner that is designed to achieve and maintain a thriving natural ecological balance on the public lands." 16 U.S.C. § 1331(a).

29.    Additionally, "[a]ll management activities shall be at the minimal feasible level." 16 U.S.C. § 1331(a).

30.    BLM must manage wild horses as self-sustaining populations of healthy animals in balance with other uses and the productive capacity of their habitat. 43 C.F.R. § 4700.0-6(a).

31.    BLM's management activities affecting wild horses shall be undertaken with the goal of maintaining wild horses and burros on public lands. 43 C.F.R. § 4700.0-6(c).

32.    The WHBA contemplates that when there are excess wild horses on the range, the Secretary could "determine whether appropriate management levels should be

7

Complaint

achieved by the removal or destruction of excess animals, or other options (such as sterilization, or natural controls on population levels)." 16 U.S.C. § 1333(b)(1).

33. Wild horses that have been removed from the range and remain in BLM holding facilities do not lose their status as wild horses under the WHBA, and the protection provided by such status. 16 U.S.C. § 1333(d).

**C.     Consolidated Appropriations Act, 2018.**

34. As an agency within the Department of the Interior (DOI), BLM is subject to Congressional limitations on the use of agency funds.

35. The 2018 Consolidated Appropriations Act specifies that: "Appropriations herein made shall not be available for the destruction of healthy, unadopted, wild horses and burros in the care of the Bureau or its contractors or for the sale of wild horses and burros that results in their destruction for processing into commercial products." Pub. L. No. 115-141, 132 Stat. 348.

**FACTUAL BACKGROUND**

**A. BLM Moves to Prevent Wild Horses from Being Sold to Slaughter: 2005-2015.**

36. Under the original text of the WHBA, BLM is authorized to remove excess wild horses from the range in order to maintain a thriving natural ecological balance. The 1971 WHBA further authorizes BLM to destroy wild horses in the most humane manner possible.

37. The American public has generally not supported the destruction, killing, or slaughter of wild horses. A 2017 survey showed that more than 70% of the respondents did not support the slaughter of wild horses.

38. On December 8, 2004, the Department of the Interior Fiscal Year (FY) 2005 Omnibus Appropriation Act (PL 108-447, Division E, Title 1, Section 142) amended the

WHBA (Public Law 92-195) and directed the sale of excess wild horses and burros that meet specific criteria.

39. Under the amended version of the WHBA, BLM has the authority, where excess horses are found to exist on the range, to direct that horses "be humanely captured and removed for private maintenance and care for which [the Secretary] determines an adoption demand exists by qualified individuals, and for which he determines he can assure humane treatment and care (including proper transportation, feeding, and handling)." 16 U.S.C. § 1333(b)(2)(B).

40. In general, any excess animal or the remains of an excess animal shall be sold if: (A) the excess animal is more than ten years of age; or (B) the excess animal has been offered unsuccessfully for adoption at least three times. 16 U.S.C. § 1331(e).

41. From FY 2010 to present, Congress has included language in the Department of Interiors' appropriations legislation prohibiting the use of federal funds to conduct unrestricted sales. This legislation has the effect of prohibiting BLM from directly destroying wild horses in its care that could be adopted. This legislation also prohibits BLM from selling excess wild horses where such a sale will result in their destruction for processing into commercial products.

42. Adoption policies and rules that were in place prior to adoption of the 2018 Wild Horse Sale Rule were designed to include safeguards to prevent the sale of excess wild horses that would result in their destruction. Since 2010, these policies and rules also were designed to ensure that BLM did not violate the provisions of the various appropriation bills prohibiting BLM from selling excess wild horses where such a sale will result in their destruction for processing into commercial products.

43. BLM's Instruction Memorandum (IM) No. 2005-101, Direction for the Sale of Wild Horses and Burros, adopted on March 11, 2005, provided for the negotiated sale of excess wild horses through the National Point of Contact or direct sales by the Group

Managers. For direct sales, Group Managers were not permitted to sell more than four animals per purchase and were directed to refer such requests to the National Point of Contact for further consideration.

44. IM No. 2005-101 specified that in negotiated sales, if there is evidence that may indicate a purchaser does not intend to provide a good home, the National Point of Contact would contact the Group Manager. In direct sales the Group Manager would contact the National Point of Contact if evidence indicated a purchaser did not intend to provide a good home.

45. IM No. 2013-032, Direction for the Sale of Wild Horses and Burros—Interim Guidance, adopted December 18, 2012, provided that without prior approval from the Assistant Director, no more than four wild horses and/or wild burros may be purchased by an individual or group within a six-month period.

46. IM No. 2013-032 further required that when buying wild horses and/or wild burros, a purchaser must describe where they intend to keep the animals for the first six months following the sale. Without prior approval from the Assistant Director, the BLM will not sell more than four animals destined for a single location in this six-month period, irrespective of who the purchaser or purchasers may be.

47. IM No. 2014-132, Guidance for the Sale of Wild Horses and Burros, adopted August 26, 2014, recognized that "[i]n recent years the sales program has received a lot of public scrutiny. This policy was developed to provide additional assurances that animals will not be processed into commercial products."

48. IM No. 2014-132 requires that requests from individuals or groups to purchase more than four animals in a six-month period need to be approved by the Assistant Director, Resources and Planning. Individuals interested in purchasing more than four animals in a six-month period are required to submit a proposal detailing where animals will be kept, plans to provide humane care including adequate forage, water, hoof

10
Complaint

and veterinary care, fencing, and the intended use for the animals.

49. IM No. 2014-132 requires that Facility Managers look up the purchaser's name in Wild Horse and Burros Program System (WHBPS) to determine if there are any documented notes in the system before they sell an animal. When there is evidence that may indicate a purchaser does not intend to provide a good home, the Facility Manager will deny the sale and document the reasons for their decision in WHBPS. The Facility Manager will then notify the Washington Office (WO) Wild Horse and Burro Sales Program Lead so that other Facility Managers can be advised of the situation and prevent such buyers from shopping from facility to facility.

**B.    Inspector General Report Finds That BLM Needs to Provide Further Safeguards to Protect Sold Wild Horses from Slaughter: 2015.**

50. The Department of the Interior Office of Inspector General released a report to the public on October 23, 2015 outlining its investigation of BLM's sale of approximately 1,700 wild horses from 2008 through 2012 that resulted in the wild horses being sent to slaughter for processing into commercial products.

51. According to the report, the purchaser said that he purchased horses from BLM by the truckload, which typically consisted of 35 horses, and paid $10 per horse. He said he could sell a load of 35 horses for about $3,500 to $4,000 and make $2,500 to $3,000 in profit on each sale. He also said that if he could obtain more horses, he would have taken them directly to Mexico himself because he could sell them for $100 each there.

52. After interviewing Wild Horse and Burro officials and reviewing records, the Office of Inspector General's investigation found that Wild Horse and Burro managers failed to enforce BLM's policy of limiting the sales of horses and ensuring that the horses went to good homes.

53. The report determined that "BLM did not follow current law while managing [the wild horse and burros]."

11
Complaint

54. In October 2015, BLM responded to the report and stated that it took additional steps to strengthen its ability to prevent this type of situation from happening. BLM noted that employees made repeated efforts to determine what plans the buyer had for the disposition of the horses he was buying, but also recognized that those practices were not strong enough to prevent the sale of wild horses that were sent to slaughter.

55. BLM also responded that it now required approval by the Assistant Director, Resources and Planning for any sale of more than four horses from any individual within a six-month period to prevent a recurrence of the situation outlined in the investigative report.

C.    **BLM's Failing Wild Horse Program and Disregard of the Public's Desire to Protect, Not Kill Wild Horses: 2016-2018.**

56. A 2013 National Research Council report opened the door for public scrutiny of BLM's Wild Horse and Burro Program.

57. In that report, the Council found that BLM has no evidence of excess wild horses and burros, primarily because BLM has failed to use scientifically sound methods to estimate the population sizes. The report made two chief criticisms of the Wild Horse and Burro Program: unsubstantiated population estimates in herd management areas (HMA), and management decisions that are not based in science.

58. By the middle of 2016, numerous investigatory news articles had begun to document the failure of BLM's Wild Horse and Burro Program. These reports generally focused on BLM's decision to continue to round up horses from the range and the huge costs associated with these roundups and long-term storage of horses. *See, e.g.*, Dollars in the Wind, The Economist (2016) *available at*: https://www.economist.com/united-states/2016/08/13/dollars-in-the-wind; They Shoot Horses, The Wall Street Journal(2016), *available at* https://www.wsj.com/articles/they-shoot-horses-with-birth-control-darts-dont-they-1472415126; Success Spoils a U.S. Program to Roundup Wild

12

Complaint

Horses, The New York Times, *available at*

https://www.nytimes.com/2016/10/15/us/wild-horses-us-west.html.

59. Many observers of the BLM program have found that BLM has prioritized using public lands under its regulation for use by commercial activities, like cattle grazing. To accommodate these commercial uses, BLM has worked to reduce the overall number of wild horses on BLM public lands. In some cases, BLM has announced it will zero out wild horse populations altogether.

60. In September 2016, the National Wild Horse and Burro Advisory Board, a nine-member body that makes no binding decisions, voted to recommend that BLM euthanize or sell all unadopted wild horses and burros in government holding facilities, approximately 45,000 wild horses at that time.

61. In 2018, BLM filed a report with Congress regarding its Wild Horse and Burro Program.

62. BLM's Report to Congress requests that Congress grant BLM the authority to sell wild horses and burros without limitation. To do so, BLM asked Congress to amend the WHBA to consider actions such as eliminating provisions in the WHBA that limit adoptions to only four animals per year; reducing the time to title an adopted wild horse or burro from one year to six months; and providing for the transfer of wild horses and burros to nonprofit organizations or other countries for humanitarian purposes or to promote economic development outside of the United States and that such transfer would cause animals to lose their protected status under the WHBA.

63. BLM's Report to Congress further requests that specific actions be categorically excluded from detailed analysis under the National Environmental Policy Act (NEPA), including, but not limited to: (1) all roundups and removals, including emergency roundups; (2) the unrestricted sale of wild horses and burros for which an adoption

demand does not exist, as determined by BLM; and (3) euthanasia of healthy wild horses and burros for which an adoption or sale demand does not exist, as determined by BLM.

64. BLM's Report to Congress focuses on placing horses and burros that are rounded up into "private care" through adoptions and sales, including international sales to countries for agricultural, law enforcement, park management, and other uses. This option would specifically allow BLM to sell without limitation or euthanize any wild horses or burros that were not placed in "private care."

65. Congress has not acted on any of BLM's requests.

**D.     BLM's 2018 Decision.**

66. The 2018 Wild Horse Sale Rule provides that "[e]ffective immediately, all facilities and state, district, and field offices must comply with the policies and guidance set forth in this IM."

67. While IM No. 2014-132 states that it is providing "guidance on selling animals to individuals and organizations that will provide good homes and humane care," the 2018 Wild Horse Sale Rule directs "all facilities and state, district and field offices to comply with the new policy" and "[t]o increase the number of sale-eligible animals in off the range corrals open to the public." Accordingly, the 2018 Wild Horse Sale Rule orders BLM to approve sales "of excess animals to individuals, companies and organizations."

68. The 2018 Wild Horse Sale Rule maintains the requirement that horses and burros younger than ten years old become eligible for sale only after being passed over for adoption three times. However, the 2018 Wild Horse Sale Rule sets a time limit for when those adoptions are to begin—six months from the date of the issuance of the 2018 Wild Horse Sale Rule or the animal's preparation date.

69. In the past, adoptions at BLM-managed corrals that are open to the public have either been nonexistent or extremely limited. The 2018 Wild Horse Sale Rule calls for all these facilities to hold monthly adoptions.

70. The 2018 Wild Horse Sale Rule also places an emphasis on using technology to increase the number of adopting events but does so in a way that reduces the likelihood of adoptions while increasing the number of wild horses available for sale. For instance, there is now no requirement for the number of days an internet adoption event must be open before it counts as an unsuccessful adoption. Under IM No. 2014-132, a wild horse had to be offered for adoption on the facility's website for a minimum of seven continuous days before the adoption event could be considered unsuccessful. Under the 2018 Wild Horse Sale Rule, there is no longer a minimum number of days. It provides that "each event will count as one adoption opportunity (strike), regardless of how many days the event lasts."

71. Although offering monthly adoptions at the corrals may lead to a few more adoptions, taken together, the changes will accelerate the time it takes to make horses and burros sale-eligible, allowing tens of thousands more wild horses and burros to be offered for sale, up to 25 at a time, for $10 to $25 apiece.

72. The 2018 Wild Horse Sale Rule increased the number of wild horses that BLM could sell without prior approval. Whereas the 2014 Rule required that requests for more than four animals in a six-month period be approved by the Assistant Director or Resources and Planning, the 2018 Rule changed this to say that requests for more than 25 animals need to be approved the Assistant Director.

73. The 2018 Wild Horse Sale Rule deleted the requirement that Facility Managers must look up a purchaser's name in the WHBPS to determine if there are any documented notes in the system before they sell an animal.

74. The 2018 Wild Horse Sale Rule deleted the requirement that, when there is evidence that may indicate a purchaser does not intend to provide a good home, "the Facility Manager will then notify the Washington Office (WO) WH&B Sales Program Lead so that other Facility Managers can be advised of the situation and prevent such buyers from

shopping from facility to facility."

75. The 2018 Wild Horse Sale Rule reduces the safeguards adopted in past policies designed to prevent the sale of excess wild horses that would result in their destruction.

76. By reversing these safeguards against slaughter, BLM has made it far more likely that these iconic animals will end up in facilities in Mexico or Canada for slaughter and use as commercial products.

77. According to the American Wild Horse Preservation Campaign:

> The new policy, implemented via an Internal Memorandum (IM) dated May 24, 2018 (but not publicly discovered until July), rolls back an Obama Administration policy limiting sales to no more than four horses/burros per buyer without written authorization from the Assistant Director of the BLM. That policy was implemented in 2013, after the BLM was exposed for selling nearly 2,000 wild horses to a known kill buyer, Tom Davis, who, in turn, sold the horses for slaughter in Mexico. It was designed to prevent federally protected wild horses and burros from entering the slaughter pipeline.
>
> The new policy does more than up the limit of horses/and burros an individual buyer can purchase at one time; it also eliminates any restrictions on the frequency at which such large purchases can be made as well as the requirement that the buyer describe the conditions under which the horses will be held, and it authorizes the purchase of horses by corporations as well as individuals and organizations.
>
> It's the latest assault on America's wild herds by an Interior Department, led by Secretary Ryan Zinke, that has twice asked Congress for permission to kill and slaughter federally protected wild horses and burros on a mass scale – both in holding facilities and on the range. Failing in the bid to legalize slaughter, the agency is now pushing the boundaries of law to empty the holding pens and clear space for the nearly 10,000 wild horses and burros it will remove from their homes on the range this year.

AWHPC, BLM's New Adoption Policy Sets Up "Excess" Wild Horses and Burros for Slaughter, *available at* *https://americanwildhorsecampaign.org/media/blm%E2%80%99s-new-sale-policy-sets-%E2%80%9Cexcess%E2%80%9D-wild-horses-and-burros-slaughter.*

78. Similarly, Ginger Kathrens, a member of the BLM National Wild Horse and

16

Complaint

Burro Advisory Board and the Director of The Cloud Foundation reports:

> Interior has ordered BLM to empty out wild horse and holding corrals by selling 24 horses at a time with no questions asked to any buyer. These are wild horses who once roamed free at little cost to the public. It doesn't take a brain surgeon to diagnose the outcome for these helpless wild horses who have lost freedom and family and will now make the ultimate sacrifice. They will end up dying a horrific death in Mexican and Canadian slaughterhouses.
>
> Despite a prohibition on such cruelty by the Interior Appropriations Committee, the Interior Secretary has mandated that the horses must be sold. All BLM public holding facilities must comply, whether they like it or not.
>
> Why is the Secretary in such a hurry to empty these facilities? The answer is this: ignoring on the range management options, BLM is scheduled to begin massive roundups of America's mustangs this fall, refilling holding facilities so they can offer them yet again to kill buyers. Ignoring humane management solutions, they will continue the annihilation of these family-loving, freedom-loving animals.

Open Letter From Ginger Kathrens: Our Wild Horses Are Slaughter-Bound, *avaiable at https://www.thecloudfoundation.org/current-events/2018/7/20/open-letter-from-ginger-kathrens-our-wild-horses-are-slaughter-bound.*

79. Indeed, this new rule emphasizing increased sales of wild horses comes at a time when BLM has also placed a greater emphasis on rounding up wild horses. In 2018, BLM proposes to round up more than 10,000 horses in the west. Roundups are planned for Colorado, Utah, Nevada, Wyoming, California, Arizona, and Oregon.

80. In addition, there is a notable increase in unplanned, so-called emergency roundups occurring on BLM public lands.

81. To the best of Plaintiff's knowledge, in 2014, BLM conducted a single emergency roundup of wild horses.

82. To the best of Plaintiff's knowledge, in 2015, BLM conducted a single emergency roundup of wild horses.

83. To the best of Plaintiff's knowledge, in 2016, BLM conducted at least six

17

Complaint

emergency roundups of wild horses.

84. To the best of Plaintiff's knowledge, in 2017, BLM conducted at least two emergency roundups of wild horses.

85. To the best of Plaintiff's knowledge, to date in 2018, BLM conducted at least six emergency round-ups of wild horses.

86. Most emergency round-ups that took place in 2018 were due to alleged range conditions, such as lack of available water on public lands.

87. Plaintiff is unaware of any emergency closures of public lands to livestock as a result of range conditions and lack of water in 2018.

## FIRST CAUSE OF ACTION
### (Failure to Conduct Notice and Comment Rulemaking)

88. Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

89. In issuing the 2018 Wild Horse Sale Rule, BLM issued a new rule that creates rights and duties. The 2018 Wild Horse Sale Rule changes the criteria for selling and buying wild horses, creates specific obligations for parties seeking to buy horses, and establishes a right to buy horses when the specified criteria are met.

90. In issuing the 2018 Wild Horse Sale Rule, BLM failed to comply with the notice and comment rulemaking requirements of the APA.

91. In issuing the 2018 Wild Horse Sale Rule, and revoking previous policies, BLM's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the 2018 Wild Horse Sale Rule should be set aside under the APA, 5 U.S.C. § 706.

## SECOND CAUSE OF ACTION
### (Failure to Provide A Reasoned Explanation For Rule Change)

92. Friends of Animals herein incorporates all allegations contained in the

Complaint

preceding paragraphs.

93.     Without providing an adequate, reasoned explanation, BLM changed its rules on selling wild horses by issuing the 2018 Wild Horse Sale Rule.

94.     In issuing the 2018 Wild Horse Sale Rule, BLM abruptly changed its previous rules that, among other things, restricted the sale of more than four animals in a six-month period, required BLM officers to look up potential buyers in the Wild Horse and Burro Program System prior to selling them, and to notify the Washington Sales Program Lead if there was evidence to indicate that the purchaser did not intend to provide a good home to the horse so that other Facility Mangers could be advised of the situation and prevent such buyers from shopping from facility to facility. The 2018 Wild Horse Sale Rule removed all of these requirements.

95.     BLM did not acknowledge this rule change, show that the new rule is permissible under the 2018 Appropriations Act, or provide a reasonable explanation for issuing the 2018 Wild Horse Sale Rule.

96.   In issuing the 2018 Wild Horse Sale Rule, and revoking previous rules, BLM's actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law. As such, the 2018 Wild Horse Sale Rule should be set aside under the APA, 5 U.S.C. § 706.

**THIRD CAUSE OF ACTION**
**(Violations of the 2018 Consolidated Appropriations Act)**

97.     Friends of Animals herein incorporates all allegations contained in the preceding paragraphs.

98.     The 2018 Consolidated Appropriations Act prohibits the sale of wild horses and burros that results in their destruction for processing into commercial products.

99.     In authorizing the 2018 Wild Horse Sale Rule, BLM removed safeguards essential to compliance with the 2018 Consolidated Appropriations Act.

100. The 2018 Wild Horse Sale Rule will likely lead to the sale of wild horses and burros that could result in their destruction for processing into commercial products.

101. BLM's actions in issuing the 2018 Wild Horse Sale Rule are arbitrary, capricious, an abuse of discretion, and not in accordance with law or required procedure. As such, the 2018 Wild Horse Sale Rule should be set aside under the APA, 5 U.S.C. § 706.

## REQUEST FOR RELIEF

Friends of Animals respectfully requests that this Court enter judgment providing the following relief:

A. Declare that BLM's actions issuing the 2018 Wild Horse Sale Rule are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and without the observance of procedure required by law in violation of the APA;

B. Vacate BLM's 2018 Wild Horse Sale Rule until such time as Federal Defendants have complied with the law;

C. Enjoin BLM from selling any wild horses pursuant to the 2018 Wild Horse Sale Rule until such time as BLM has complied with the law;

D. Award Plaintiff reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*, and/or all other applicable authorities; and/or

E. Grant such further relief as the Court deems just and equitable.

Dated: August 9, 2018                          Respectfully submitted,


                                               s/R. Scott Jerger

                                               R. Scott Jerger, (Oregon Bar No. 023377)
                                               Field Jerger LLP
                                               American Bank Building
                                               621 SW Morrison Street, Suite 510
                                               Portland, OR 97205
                                               (503) 228-9115
                                               scott@fieldjerger.com

                                               *Attorney for Plaintiff*

20

Complaint